**EXCEL AUTO AND TRUCK LEASING, L.L.P.,**
Appellant,

v.

**ALIEF INDEPENDENT SCHOOL DISTRICT,** Charterwood Municipal Utility District, Chelford One Municipal Utility District, Cimarron Municipal Utility District, City of Baytown, City of Deer Park, City of Houston, City of Katy, City of Pasadena, Clear Brook City Municipal Utility District, CY–Champ Public Utility District, Cypress–Fairbanks Independent School District, Deer Park Independent School District, Fallbrook Utility District, Goose Creek Consolidated Independent School District, Harris County, Harris County Education Department, Harris County Emergency Service District No. 1, Harris County Emergency Service District No. 7, Harris County Emergency Service District No. 9, Harris County Emergency Service District No. 28, Harris County Flood Control District, Harris County Fort Bend Emergency Service District No. 100, Harris County Hospital District, Harris County Municipal Utility District No. 33, Harris County Municipal Utility District No. 38, Harris County Municipal Utility District No. 64, Harris County Municipal Utility District No. 81, Harris County Municipal Utility District No. 120, Harris County Municipal Utility District No. 132, Harris County Municipal Utility District No. 158, Harris County Rural Fire Prevention District No. 13, Harris County Rural Fire Prevention District No. 16, Harris County Rural Fire Prevention District No. 17, Harris County Rural Fire Prevention District No. 20, Harris County Rural Fire Prevention District No. 24, Harris County Rural Fire Prevention District No. 25, Harris County Rural Fire Prevention District No. 26, Harris County Rural Fire Prevention District No. 29, Harris County Rural Fire Prevention District No. 46, Harris County Rural Fire Prevention District No. 48, Harris County Utility District No. 6, Harris County Water Control and Improvement District No. 113, Harris County Water Control and Improvement District No. 132, Harris County Water Control and Improvement District No. 133, Horsepen Bayou Municipal Utility District, Houston Community College District, Houston Independent School District, Humble Independent School District, Katy Independent

School District, Klein Independent School District, Lake Forest Utility District, Lee College District, Louetta North Public Utility District, North Belt Utility District, North Forest Independent School District, North Harris Montgomery Community College District, Northpark Public Utility District, Northwest Harris County Municipal Utility District No. 16, Pasadena Independent School District, Ponderosa Forest Utility District, Port of Houston Authority of Harris County, Rankin Road West Municipal Utility District, Sagemeadow Utility District, San Jacinto Community College District, Spring Branch Independent School District, Spring Independent School District, Timber Lane Utility District, West Harris County Municipal Utility District No. 6, Appellees.

No. 01–04–01185–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 31, 2007.

Rehearing Overruled Aug. 31, 2007.

Bonner Smith, Law Offices of Bonner Smith, Lubbock, TX, for Appellant.

R. Greg East, Perdue, Brandon, Fielder, Collins, & Mott, Josh Kahn, Coats, Rose, Yale, Holm, Ryman, & Lee, Houston, TX, for Appellees.

Panel consists of Justices TAFT, KEYES, and HANKS.

### OPINION ON REHEARING

GEORGE C. HANKS, JR., Justice.

We withdraw our Opinion of April 19, 2007 and issue this one in its stead. Excel Auto and Truck Leasing, L.L.P.'s motion for rehearing is denied.

In this suit for delinquent ad valorem taxes, Excel Auto & Truck Leasing, L.L.P., appellant/taxpayer, complains of the trial court's granting summary judgment in favor of the various taxing units, appellees. In three issues, Excel argues that the trial court erred in (1) finding that it was the owner of the vehicles and liable for ad valorem taxes; (2) finding that there was no genuine issue as to any material fact as to ownership of the vehicles; and (3) granting summary judgment to

Pasadena Independent School District ("ISD"), which filed no Motion for Summary Judgment, rendering the judgment interlocutory.

We affirm.

## Background

This action arises from the non-payment of ad valorem taxes by Excel Auto & Truck Leasing, L.L.P. Pasadena ISD filed a delinquent tax suit against Excel, and numerous taxing units intervened. The intervening taxing units sought to collect delinquent personal property taxes on vehicles that the taxing units allege were owned by Excel. The Tax Master recommended judgment for the taxing units, and Excel appealed the recommendation to the trial court and requested a jury trial de novo. The taxing units moved for summary judgment contending that Excel is the owner of the vehicles for which the 2002 and 2003 delinquent taxes are due and owing, and Excel is responsible for the payment of those taxes. Attached to the motions were certified copies of the delinquent tax records.

Excel responded by asserting that it does not own the vehicles because its "leases" are actually security agreements. It argued that "it is not the owner of the vehicles and the lease agreement form used is actually a security agreement creating a security interest in the vehicles its customers own." Its customers have possession of the automobiles and insure and care for them, but Excel maintains a lien by possession of the original title. Excel included an affidavit from Larry Tschoerner, Excel's general manager and finance director, in which he testified that Excel's customers were responsible for paying the taxes on their vehicles. The affidavit further states that, "in addition, pursuant to the terms of the agreement, these agreements could not be terminated by a customer." Excel asked the trial court to deny the taxing units' motions for summary judgment, enter judgment in favor of Excel as to no tax liability, or "on the alternative, that the Court find as a matter of law, that the form agreement Excel used was a security agreement, and/or that Excel is not the owner of the vehicles, or, in the alternative, that one or both of these matters should be submitted to the Jury in this case for a determination of the fact questions involved."

The trial court found that there was no genuine issue as to any material fact that the taxing units were entitled to judgment as a matter of law and that the motions should in all things be granted against Excel Auto and Truck Leasing, L.L.P. and Excel Lease Fund, Inc. as successor in interest to BLJ & Associates, Inc. d/b/a Excel Financial Company (in rem only).[1]

## Interlocutory Judgment

In issue three, Excel contends that the trial court erred in granting summary judgment to Pasadena ISD, which filed no motion for summary judgment, rendering the judgment interlocutory.

The taxing units supplemented the appellate record with Pasadena ISD's motion for summary judgment. We overrule issue three.

## Ownership of Vehicles

In issues one and two, Excel argues that the trial court erred in finding that it was the owner of the vehicles and liable for ad valorem taxes and in finding that there was no genuine issue as to any material fact as to ownership of the vehicles.

1. Excel Lease Fund, Inc. as successor in interest to BLJ & Associates, Inc. d/b/a Excel Financial Company is not a party to this appeal.

### Summary Judgment Standard of Review

A party moving for summary judgment must conclusively prove all of the elements of its cause of action or defense as a matter of law. TEX.R. CIV. P. 166a(c); *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 566 (Tex. 2001); *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222–23 (Tex.1999). When, as here, both sides move for summary judgment, and the trial court grants one motion but denies the other, a reviewing court should review both sides' summary judgment evidence, determine all questions presented, and render the judgment that the trial court should have rendered. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex.2000). When a summary judgment does not specify or state the grounds on which the trial court relied, the non-movant on appeal must negate any grounds on which the trial court could have relied, and we will affirm the summary judgment on appeal if any of the grounds presented in the motion is meritorious. *See Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 173 (Tex. 1995); *Mellon Serv. Co. v. Touche Ross & Co.*, 17 S.W.3d 432, 435 (Tex.App.-Houston [1st Dist.] 2000, no pet.). A non-movant is required to show that each ground alleged in the motion for summary judgment was insufficient to support summary judgment. *Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex.1995).

### Ad Valorem Taxes

All tangible personal property is taxable unless otherwise exempt by law. TEX. TAX CODE ANN. § 11.01 (Vernon 2004). Property taxes "are the personal obligation of the person who owns or acquires the property on January 1 of the year for which the tax is imposed." TEX. TAX CODE ANN. § 32.07 (Vernon 2004). In a prosecution for the collection of delinquent taxes, certified copies of a taxing unit's tax records or tax statements constitute prima facie evidence of all of the elements of the taxing unit's petition, including ownership of the property, and create a presumption that the taxing units complied with all of the requirements imposed upon them by law. TEX. TAX CODE ANN. § 33.47(a) (Vernon 2004); *Davis v. City of Austin*, 632 S.W.2d 331, 333 (Tex.1982); *Aldine Indep. Sch. Dist. v. Ogg*, 122 S.W.3d 257, 263–64 (Tex. App.-Houston [1st Dist.] 2003, no pet.). It is an affirmative defense to tax liability that the person against whom the tax is assessed was not the owner of the property at the time of assessment. TEX. TAX CODE ANN. § 42.09(b)(1) (Vernon 2004). It has also been held that a person holding a lien or other security upon the property is not an owner for tax purposes. *Comerica Acceptance Corp. v. Dallas Cent. Appraisal Dist.*, 52 S.W.3d 495, 497 (Tex.App.-Dallas 2001, pet. denied).

Here, the taxing units attached certified copies of their tax records to their motions for summary judgment, thus establishing their prima facie case. In response, Excel asserted the affirmative defense that it was not the owner of the vehicles because its leases should be interpreted as security agreements, making the lessees the actual owners of the vehicles. Excel did not dispute the amount of taxes or any aspect of the levy of the taxes. Its only dispute is whether it can be taxed as the owner of the vehicles. The taxing units argue that, because Excel is the owner of the property and not merely a lienholder or a secured party as it claims to be, Excel is personally liable for the property taxes imposed.

### Analysis

The Texas Business and Commerce Code controls the determination of whether a transaction, in the form of a lease, creates a lease or security interest. TEX. BUS. & COM.CODE ANN. § 1.203 (Vernon

Supp.2006). Section 1.203 sets forth the following two-part test to determine whether an agreement constitutes a lease or a security interest:

**Lease Distinguished From Security Interest**

(a) Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case.

(b) A transaction in the form of a lease creates a security interest if *the consideration that the lessee is to pay the lessor for the right to possession* and use of the goods is an obligation for the term of the lease and *is not subject to termination by the lessee, and:*

(1) the original term of the lease is equal to or greater than the remaining economic life of the goods;

(2) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

(3) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; *or*

(4) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

. . .

*Id.* (emphasis added). By enacting Section 1.203, Texas has adopted the official version of Uniform Commercial Code Section 1–201(37). Accordingly, we are guided by decisions from other jurisdictions which interpret this uniform statute. *See e.g., Franklin Nat'l Bank v. Boser,* 972 S.W.2d 98, 103 (Tex.App.-Texarkana 1998, pet. denied).

■ To create a security interest, the first part of this test requires that the rental payments the lessee must pay cannot be terminable by the lessee during the term of the lease. TEX. BUS. & COM.CODE ANN. § 1.203. This factor requires the existence of a "hell or high water" clause. *See In re Triplex Marine Maint. Inc.,* 258 B.R. 659, 669 (Bankr.E.D.Tex.2000). A "hell or high water" clause requires that the lessee, once it accepts the leased item, must pay its rent in all events (i.e., come hell or high water) without regard for the proper function of the item or the conduct of the lessor with respect to the subject or any other transaction. *See id.* at n. 20.[2] The second part of the conjunctive test lists four factors, one of which must also exist for the lease to be deemed a security interest.[3]

■ This two-part test focuses on the economics of the transaction rather than the intent of the parties or the label of the document. *Boser,* 972 S.W.2d at 103; *In re Triplex Marine Maint. Inc.,* 258 B.R. at 668–69. For leases which satisfy the foregoing bright-line two-part test, the inquiry comes to an end—such leases constitute security interests as a matter of law. *In re Triplex Marine Maint. Inc.,* 258 B.R. at 668–69. If the bright-line test is not satis-

---

2. Under the previous version of this statute, the existence of a "hell or high water clause" was also a requirement to create a security interest. *See, e.g., In re Rigg,* 198 B.R. 681, 685 (Bankr.N.D.Tex.1996) (stating that "[a] lease agreement can be construed to create a security interest only if the agreement prohibits the lessee from terminating the lease.").

3. For purposes of the summary judgment motion, the parties do not dispute that one of these four factors exists in this case: (4) that the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

fied, the finding of a security interest is not mandated, and the court may examine additional facts, recognized by the statute, to determine whether the economic realities of a particular transaction create a security interest. *Id.*

■ In this case, Excel's Motor Vehicle Lease Agreements do not meet the first part of the test because they do not contain "hell or high water" clauses. Instead, they contain provisions, which specifically state that the entire lease, including the provisions for the payment of the rent over the term of the agreement, can be terminated at any time at the will of the lessee. Paragraphs 23 of Excel's Motor Vehicle Lease Agreements provide as follows:

23. **LEASE TERMINATION:** This Lease will end ("terminate") when one of the following events occurs, whichever happens first: *(a) You choose to end this Lease early and return the Vehicle to us; ...*

This language cannot meet the first part of the test because, unlike a hell or high water clause, it does not require the payment of all rents, *both past due and due in the future for the term of the lease,* upon a lessee's termination of the lease. *See, e.g., In re Triplex Marine Maint. Inc.,* 258 B.R. at 669 (holding that the first part of the test was met by the inclusion of the following language in the lease in capital letters under the heading of "Important Conditions" that: "YOU [the debtor] UNDERSTAND AND AGREE THAT: (A) THE LEASE CANNOT BE CANCELED BY YOU AT ANY TIME FOR ANY REASON....").

Nevertheless, Excel argues that its leases satisfy the first part of the test because a "hell or high water" clause is not required—the leases' early termination clause serves the same function. We disagree.

Excel has not cited to us, nor do we find, any case law under the current version of Section 1.203 that dispenses with the requirement of an express hell or high water clause to establish the existence of a security interest.[4] Furthermore, the early termination provision cannot substitute for a hell or high water clause because it does not prevent the lessee from terminating the agreed upon consideration to Excel— the payment of the full amount of the rental payments under the lease. The early termination clause does not require that, at the time of termination, the lessee still be responsible for payment of past due *and unmatured or future rental payments under the terms of the lease.* In fact, in the event of a lessee termination, the amount paid to Excel for future rental fees will vary depending on the calculation of the "realized value" of the vehicle versus the "adjusted lease balance" due on the vehicle at the time of termination. Paragraph 24 of Excel's Motor Vehicle Lease Agreements provides that:

24. **EARLY TERMINATION:** This section applies if the Lease terminates before the end of the scheduled Lease term.... On early termination, you will return the Vehicle to us. You will deliver it to our address or to another reasonable location at our request.

---

4. To the extent that Excel relies on caselaw developed under the previous version of Section 1.203 to argue that a hell or high clause is not required for a security interest to exist, we find this caselaw not helpful to our analysis in this case. As noted by the court in *Triplex,* the current version of Section 1.203 contains significant changes to the statute. *In re Triplex Marine Maint. Inc.,* 258 B.R. at 669. As a result, prior cases consider certain factors as attributes of a security interest, which are no longer considered as such under the current version. *Id.*

(a) **Early Termination Liability.** On early termination, you agree to pay us:

(1) A VEHICLE RETURN FEE, if any, given in section 28(b);

(2) All accrued and unpaid amounts that *are due or past due at that time* ...;

(3) *The amount by which the "Adjusted Lease Balance" is greater than the "Realized Value:* [sic] *of the Vehicle"* [5] ...; and

(4) All official fees and taxes imposed in connection with the Lease termination.

At best, this provision is nothing more than a liquidated damages provision, not the functional equivalent of a hell or high water clause. Thus, we hold that Excel's leases do not satisfy the two-part test for establishing the existence of a security interest.

### Other Considerations

We next turn to an examination of the lease to determine whether there are any other factors that have been recognized by the courts to indicate the existence of a security interest. Courts have recognized that, if, under the terms of the lease, a lessee has no equity interest whatsoever in the property, the lease may be a true lease and not a security interest. *Touch of*

*Class Leasing v. Mercedes–Benz Credit of Canada, Inc.,* 248 N.J.Super. 426, 591 A.2d 661, 665–66 (1991). This is the case here. Excel's leases expressly provide that the lessee has no equity interest in the vehicle. Paragraph 27 of Excel's Motor Vehicle Lease Agreements provides, in pertinent part, as follows:

27. **TITLING, OFFICIAL FEES AND TAXES:** You understand and agree that this agreement *is a lease only. We own the Vehicle and it will be titled in our name or in the name of our assignee. You have no ownership interest in the Vehicle* except for any future options to purchase provided in this Lease.

Excel argues that, despite the language above, the leases are security interests, not true leases, because, under their terms, the lessee is required to: pay taxes, if any, on the vehicle; pay for and maintain insurance on the vehicles; and pay for the service and maintenance of the vehicle. However, contrary to Excel's arguments, courts have held that lessee's acceptance of the costs similar to those stated in Excel's lease are typical of true leases, not secured transactions, and more likely reflect the relative bargaining power between parties rather than the character of the transaction. *See Rainier Nat'l Bank v. Inland Mach. Co.,* 29 Wash.App. 725,

---

5. **Paragraph 24(c) provides as follows:**

(c) **Determining the Realized Value.** If the law so requires, we will send you a notice and wait any required period of time before taking action to establish the Vehicle's Realized Value. Unless otherwise required by law, the Realized Value will be determined in one of the following ways: (1) by a written agreement between you and us reached within 15 days of the Vehicle's return; (2) by the professional appraisal of an independent third party agreed to by you and us and obtained at your expense within 15 days of the Vehicle's return (or longer period, if all parties so agree or if the law so requires). The appraisal shall be of the Vehicle's wholesale value and shall be final and binding on both you and us; or (3) if it is not determined within 15 days of the Vehicle's return, we will determine the Realized Value in accordance with accepted practices in the automobile industry for determining the wholesale value of used vehicles by obtaining a wholesale cash bid for the purchase of the Vehicle or by disposing of the Vehicle in an otherwise commercially reasonable manner....

631 P.2d 389, 395 (1981) (stating that "lessor is either going to include those costs within rental charge or agree to lower rent, if lessee takes responsibility for them"); *Mr. C's Rent To Own v. Jarrells (In re Jarrells)*, 205 B.R. 994, 998–99 (Bankr.M.D.Ga.1997) (recognizing that, while debtor would be responsible for all repairs, maintenance, taxes, and insurance, these factors alone are not controlling). Business and Commerce Code Section 1.203(c) specifically addresses this issue and notes that such facts are not controlling in the determination of a security interest:

> (c) A transaction in the form of a lease does not create a security interest merely because:
>
> . . .
>
> (2) the lessee assumes risk of loss of the goods;
>
> (3) the lessee agrees to pay, with respect to the goods, taxes, insurance, filing, recording, or registration fees, or service or maintenance costs;

Tex. Bus. & Com.Code Ann. § 1.203(c) (Vernon Supp.2006).

Excel's leases do not comply with the two-part test for the existence of a security interest rather than a lease. This mandates the conclusion that the agreements are true leases, and Excel is the owner of the vehicles. Accordingly, Excel's affirmative defense of nonownership, based on its claim that its leases with its customers were security interests, fails as a matter of law. *See* Tex. Bus. & Com.Code Ann. § 1.203(b); *In re Powers*, 983 F.2d 88, 90 (7th Cir.1993) ("where a lessee has the right to terminate the lease before the option arises to purchase the property for no additional or nominal consideration, the lease is a true lease and cannot be a conditional sale"); *In re Yarbrough*, 211 B.R. 654, 658–59 (Bankr.W.D.Tenn.1997)

(noting that court found it sufficient for finding of true lease that lease was terminable at will); *In re Arthur Rigg*, 198 B.R. 681, 685 (Bankr.N.D.Tex.1996) (court held that "[a] lease agreement can be construed to create a security interest only if the agreement prohibits the lessee from terminating the lease," if it does not, then the agreement is considered a true lease rather than a security agreement).

We hold that, because the taxing units' production of certified copies of tax records or tax statements constituted prima facie evidence of all the elements in their petitions and Excel's affirmative defense of nonownership failed, there is no genuine issue of material fact for the trial court to determine in this case. Excel failed to rebut the taxing units' prima facie case of ownership. We overrule Excel's issue one.

### Fact Question

In issue two, Excel contends that the trial court erred in finding that there was no genuine issue as to any material fact as to ownership of the vehicles.

Once the movant establishes that it is entitled to summary judgment, the non-movant can defeat that showing only by producing evidence that raises a fact issue. *Haight v. Savoy Apartments*, 814 S.W.2d 849, 851 (Tex.App.-Houston [1st Dist.] 1991, writ denied). "To constitute competent summary judgment evidence, affidavits must be made on personal knowledge, set forth facts as would be admissible in evidence and show affirmatively that the affiant is competent to testify to matters stated therein." Tex.R. Civ. P. 166a(f).

Larry Tschoerner, Excel's general manager and finance director, submitted an affidavit in which he testified that Excel's customers were responsible for paying the taxes on their vehicles. Most of Tschoerner's affidavit focused on addressing the

four factors listed in Section 1.203 of the Texas Business and Commerce Code. Having already held that Excel's leases expressly provide that they are subject to termination by the lessee—the prerequisite to considering the four additional factors—we need not examine Tschoerner's affidavit pertaining to these four factors.

The affidavit further states that, "in addition, pursuant to the terms of the agreement, these agreements could not be terminated by a customer." This is contrary to the plain language of the agreement. Whether a contract is ambiguous is a question of law. *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex.2000). If a court determines that a contract is ambiguous, then the court may consider extraneous evidence to ascertain the true meaning of the instrument. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995). Here, neither party has claimed ambiguity in the subject lease agreements. Accordingly, we may not consider Tschoerner's testimony that changes the plain language of the lease agreements, as noted above.

We hold that there is no genuine issue as to any material fact as to ownership of the vehicles. We overrule issue two.

### Conclusion

Because Excel failed to raise a material fact issue refuting the ownership of the vehicles, we hold that the trial court did not err in denying Excel's summary judgment. We affirm the trial court's judgment.

Justice KEYES concurring in the judgment.

Justice KEYES dissenting from denial of rehearing.

EVELYN V. KEYES, Justice, concurring in the judgment and dissenting from denial of rehearing.

I concur in the judgment and I dissent from denial of appellant/taxpayer Excel Auto & Truck Leasing, L.L.P.'s ("Excel" 's or "Excel Auto" 's) motion for rehearing. This suit for delinquent ad valorem taxes is important both as a tax case and as a case of first impression in Texas regarding the distinction between a lease and a security agreement under section 1.203 of the Uniform Commercial Code (UCC), codifying former section 1.201(37) of the Code. The issue is whether Excel, a motor vehicle leasing company, is the owner for ad valorem tax purposes of the vehicles it leases or whether the lessees of the vehicles are the owners and responsible for the taxes. Excel argues that its "Motor Vehicle Leasing Agreement" ("Lease" or "Agreement") is, as a matter of economic reality, a security agreement executed in connection with its financing of the purchase of the vehicles by the lessees and that, therefore, they, not it, are the owners of the vehicles for tax purposes.

Our April 19, 2007 judgment affirmed the trial court's summary judgment in favor of the various taxing units, appellees, on the ground that the Lease Agreement was a lease, and not a mere security agreement, and that, therefore, Excel was the owner of the vehicles for ad valorem tax purposes. In its motion for rehearing, Excel contends that we erred in construing the Lease Agreement as a lease rather than as a security agreement and, therefore, in affirming its liability for ad valorem taxes that are properly chargeable to its lessees. In response, the majority has withdrawn the April 19 opinion and substituted a new opinion explaining the basis for its conclusion. The panel continues to affirm summary judgment in favor of the taxing authorities. Because I disagree

with the majority's reasoning, but agree with its conclusion, I concur in the judgment only.

### "Ownership" for Tax Purposes

The issue in this case is the ownership for ad valorem tax purposes of the vehicles Excel leases. The majority bases its conclusion that Excel is the owner of the leased vehicles on its determination that Excel is not a lienholder. *See Comerica Acceptance Corp. v. Dallas Cent. Appraisal Dist.*, 52 S.W.3d 495, 497 (Tex.App.-Dallas 2001, pet. denied) (lienholder is not owner of property within "the common meaning of that term"). The majority does not address the construction of the term "owner" under the Tax Code, which I would deem to be the controlling issue.

All tangible personal property, including motor vehicles, is taxable unless exempted by law. *See* TEX. TAX CODE ANN. § 11.01 (Vernon 2001). A person is entitled to an exemption from taxation of personal property that is not used for the production of income. *Id.* § 11.14 (Vernon Supp.2006). The leased vehicles are used by Excel, but not by its lessees, for the production of income. Indeed, the Lease specifically provides that the lessee agrees "not to use the Vehicle as a taxi or for other public or private hire or delivery."[1] The person who owns the property on January 1 of the tax year is the person liable for the tax. TEX. TAX CODE ANN. § 32.07 (Vernon Supp. 2006). Vehicle registration records in this case show that appellant, Excel Auto, is the title owner of the vehicles and that Excel Lease Fund, Inc. is the lien holder.

For purposes of construing the ad valorem tax statutes, an "owner" of property has been construed as "a person or entity holding legal to the property, or holding an equitable right to obtain legal title to the property." *Comerica Acceptance*, 52 S.W.3d at 497. Equitable title is the present right to compel legal title. *Travis Cent. Appraisal Dist. v. Signature Flight Support Corp.*, 140 S.W.3d 833, 840 (Tex. App.-Austin 2004, no pet.); *Comerica*, 52 S.W.3d at 497–98. Generally, the person having legal title to the property, or the equivalent, is considered to be the owner for taxation purposes. *See Childress County v. State*, 127 Tex. 343, 92 S.W.2d 1011, 1015 (1936); *General Elec. Capital Corp. v. City of Corpus Christi*, 850 S.W.2d 596, 599 (Tex.App.-Corpus Christi 1993, writ denied) (explaining that taxing entity may impose ad valorem taxes on secured party in possession or with right of possession even though actual legal title is not party's name; for ad valorem tax purposes, secured party in possession is equivalent of title owner).

Here, the Lease Agreement provides that Excel retains title to the leased vehicles until the purchase option is exercised. Lessees have no present right to compel Excel to transfer title to them. Rather, they can compel transfer of title *only* by fulfilling conditions set by Excel for early termination of the lease and purchase of the vehicle or by completing the lease payments and exercising the option to buy the vehicle for $4,000. Even at the end of the lease term, the option must have been granted, Excel must not have declared the lease payments in default, and the lessee must have given Excel 30 days notice. Thus, since the lessees are neither the legal title owners nor the equitable owners of the vehicles leased to them by Excel, the owner for ad valorem tax purposes is

---

1. The Tax Code provides an exemption for motor vehicles leased for personal use if the lease was entered into after January 2, 2001, provided that the lessor requires the lessee to complete a form certifying that the vehicle is not used for the production of income. TEX. TAX CODE ANN. § 11.252(d) (Vernon Supp. 2006).

Excel. *See Signature Flight Support*, 140 S.W.3d at 841 ("Here, the lease agreements clearly and unambiguously state that the City holds legal title to the improvements after it accepts them. Appellees do not have equitable title, for they have no grounds to compel the City to give them legal title; they may merely operate and use the facilities in accordance with the lease terms."). I would, therefore, affirm the summary judgment entered in favor of the taxing units.

### The Motor Vehicle Leasing Agreement

Excel contends, however, that we should determine ownership of the vehicles for tax purposes by reference to the nature of its transaction with its lessees, not by either equitable or title ownership of the vehicles. It contends that we should look beyond the titleholder (Excel itself) and construe the Lease not as a lease but as a disguised security interest it holds to secure the lessees' payment of the full consideration of the vehicles pursuant to its sale of the vehicles to them. It contends that Section 1.203 of the Texas UCC, which distinguishes a security interest from a lease, controls this case. It further contends, in its motion for rehearing, that we did not properly construe Section 1.203

and, therefore incorrectly held that the Lease Agreement was a lease and not a mere security interest.

I disagree with Excel that the issue of whether its leases are true leases or security interests is controlling for tax purposes. However, because the issue of whether the Lease Agreement is a disguised security interest or a true lease is raised by Excel as an affirmative defense and addressed by the majority, and because this issue is important to business relationships within the scope of the UCC, I address it below.[2] I would hold that the Lease Agreement is a true lease and that Excel is the owner of the vehicles for UCC purposes as well as for ad valorem tax purposes, although I would not analyze the law the same way the majority does.

### Excel's "Motor Vehicle Lease Agreement"

Excel's Lease Agreement provides:

23. **LEASE TERMINATION:** This Lease will end ("terminate") when one of the following events occurs, whichever happens first: (a) You choose to end this Lease early and return the Vehicle to us; ... On termination you will pay the amounts agreed in this Lease. **You are not entitled to keep**

2. Whether a transaction is a lease or a sale is important for commercial purposes and for the determination of creditors' rights under the Bankruptcy Code. A true lease is subject to article 2A of the UCC; but a sale is not a lease and, therefore, is not subject to article 2A. *See* TEX. BUS. & COM.CODE ANN. § 2A.102 cmt. 1 (Vernon 1994) ("[T]he definition of lease does not include a sale ... or retention or creation of a security interest ...; sales and security interests are governed by other Articles of this Act."); *see also id.* § 2A.103(10) (Vernon Supp.2006) (" 'Lease' means a transfer of the right to possession and use of goods for a term in return for consideration, but a sale ..., or retention or creation of a security interest is not a lease."); *Franklin Nat'l Bank v. Boser*, 972 S.W.2d 98,

102–04 (Tex.App.-Texarkana 1998, pet. denied) (provisions of article 9 of UCC apply to secured transaction disguised as lease); *Superior Packing, Inc. v. Worldwide Leasing & Fin., Inc.*, 880 S.W.2d 67, 71 (Tex.App.-Houston [14th Dist.] 1994, pet. denied) (same); *see also In re Bailey*, 326 B.R. 156, 160 (Bankr. W.D.Ark.2005) (if transaction is construed as sale of personal property and is secured by perfected security interest, debtor in bankruptcy must propose to treat creditor's claim as provided in section 1325(a)(4) and (5) of Bankruptcy Code; if transaction is true lease and Debtor desires to keep property, then Debtor must assume lease, cure all defaults, and perform lease according to its terms in compliance with sections 1322(b)(7) and 365 of Code).

the Vehicle past the end of the scheduled Lease term or the date of early termination without our prior consent.

24. **EARLY TERMINATION:** This section applies if the Lease terminates before the end of the scheduled Lease term.... On early termination, you will return the Vehicle to us. You will deliver it to our address or to another reasonable location at our request.

(a) **Early Termination Liability.** On early termination, you agree to pay us:

(1) A VEHICLE RETURN FEE, if any, given in section 28(b);

(2) All accrued and unpaid amounts that are due or past due at that time ...;

(3) The amount by which the "Adjusted Lease Balance" is greater than the "Realized Value: [sic] of the Vehicle" .... and;

(4) All official fees and taxes imposed in connection with the Lease termination.

(emphasis in original).

The Lease thus provides that the lessee may terminate the lease at any time upon compliance with its terms. Upon termination of any sort, the lessee "will pay the amounts agreed in this lease," and he must return the vehicle unless he has the option to purchase it. Upon early termination, the lessee must deliver the vehicle to Excel together with (1) a vehicle return fee; (2) all due and past due unpaid accrued amounts for use of the vehicle; (3) "[t]he amount" by which the "Adjusted Lease Balance" is greater than the "Realized Value: [sic] of the Vehicle"; and (4) "[a]ll official fees and taxes imposed in connection with the Lease termination." [3] If the lease is not in default after a specified number of months (30 months of the 60 month lease), the lessee has the option to purchase the vehicle by paying all fees, taxes, and other costs incurred for the purchase and all other fees and charges due or past due under the lease, plus the Adjusted Lease Balance. Under the terms of the Lease, the lessee's Base Monthly Payment is applied first to reduce the "Rent Charge," "in a way," the Lease states, "that is similar to interest for loans." The remainder is applied to reduce the Adjusted Lease Balance. Thus, "[a]t any given time, the Adjusted Lease Balance is equal to: (1) the Vehicle's Residual Value ..., plus (2) the total of all remaining unpaid Base Monthly Payments, *minus (3) the amount of the unearned Rent Charge* at that time." (emphasis added). The lessee agrees to pay a Vehicle Return Fee of $4,000 if the Lease is terminated before the end of the Lease term and the vehicle is returned, but not if he purchases the vehicle. If the lessee has an option to purchase the vehicle, he may exercise the option at the end of the Lease term for $4,000 if Excel has not declared

---

**3.** The Lease provides that at the beginning of the Lease, the Adjusted Lease Balance is equal to the Adjusted Capitalized Cost of the vehicle, i.e., the Gross Capitalized Cost minus the amount of any net trade-in allowance, rebate, noncash credit, or cash that reduces the Gross Capitalized Cost, i.e., that reduces the agreed upon value plus any items paid over the lease term, such as service contracts, insurance, and outstanding prior credits or lease balances. If all payments are made on time and other lease obligations are met, the monthly payments are "applied to reduce the Adjusted Lease Balance so that at the end of the Lease term the Adjusted Lease Balance equals the Vehicle's Residual Value," i.e., its wholesale value as determined by Excel, in accordance with industry standards, "by obtaining a wholesale cash bid for the purchase of the Vehicle or by disposing of the Vehicle in an otherwise commercially reasonable manner." The Realized Value is zero if the vehicle is not returned.

the lease payments in default and the lessee has given Excel 30 days notice.

Additionally, the Lease provides that the lessee assumes the risk of any loss or damage to the vehicle and the risk of theft or total loss of the vehicle. The leased vehicle conveys no warranties by Excel. The lessee agrees to pay all maintenance and operating costs. Finally, the Lease provides:

> **TITLING, OFFICIAL FEES AND TAXES:** You understand and agree that this agreement is a lease only. We own the Vehicle and it will be titled in our name or in the name of our assignee. You have no ownership interests in the Vehicle except for any future option to purchase provided in this Lease. **You agree to pay all title, registration, license, sales, use, excise, personal property, ad valorem, inspection, testing, and all other taxes, fees and charges imposed by government authorities in connection with the Vehicle and this Lease during the Lease term, except our income taxes. ...**

(emphasis in original). There is no option to renew the Lease.

A sample completed Lease form taken from the record and attached to appellant's brief shows a lease dated March 20, 2002 for a used Mercedes Benz 2001 model S55 AMG. The agreed upon value of the vehicle is $115,516.20, which, after Capitalized Cost Reduction of $47,243.99 (including $53,000 paid at signing), yields an Adjusted Capitalized Cost of $68,272.21, which is used for calculating Base Monthly Payments. In addition to the down payment of $53,000, the lessee must make total monthly payment of $1,756.01, so that by the end of the 60–month lease period the lessee will have paid $152,604.59.

In sum, although Excel's customers have possession and use of the vehicles and insure and maintain them, Excel possesses legal title to the vehicles, maintains a lien on them, and passes through taxes to the lessees. The lessees must make all agreed payments as specified in the lease, either to retain possession and use of the vehicle or to purchase it. Payments go first to pay down "interest" costs and afterwards to satisfy the realized value of the vehicle. The lessees bear all costs of maintenance, insurance, and loss. They have no legal title to the vehicles, as the Lease informs them, and, according to the Lease, no ownership rights. Rather, to obtain legal title to the vehicles and ownership, the lessees must comply with all terms of the Lease and, in addition, pay costs of purchase as determined by Excel, plus the Adjusted Lease Balance as determined by Excel. Alternatively, they may complete the Lease term and purchase the vehicles for $4,000 if the purchase option has been granted them, they are not in default, and they have given notice to Excel. The vehicles retain residual value at the end of the lease term and must be returned to Excel unless the purchase option is exercised.

The question for this Court is whether Excel's Lease Agreement is a lease or whether it is a security agreement attendant on the contingent sale of the vehicles to the lessees under the terms of UCC Section 1.203.

### UCC Section 1.203

Under the UCC, a lease is "a transfer of the right to possession and use of goods for a term in return for consideration, but *a sale ...*, *or retention or creation of a security interest is not a lease.*" TEX. BUS. & COM.CODE ANN. § 2A.103(10) (Vernon Supp.2006) (emphasis added). A "[l]ease agreement" is "the bargain, with respect to the lease, of the lessor and the lessee in fact as found in their language or by implication from other circumstances ... as provided by this chapter." *Id.*

§ 2A.103(11). A "security interest," by contrast, is "an interest in personal property ... which secures payment or performance of an obligation." TEX. BUS. & COM.CODE ANN. § 1.201(35) (Vernon Supp. 2006).

Section 1.203 of the UCC distinguishes a lease from a security interest. For a lease agreement to qualify as a security agreement, the consideration for the transaction must not be subject to termination by the lessee and the agreement must satisfy at least one of the four factors in subsection 1.203(b). TEX. BUS. & COM.CODE ANN. § 1.203(b) (Vernon Supp.2006). Section 1.203 provides:

**Lease Distinguished From Security Interest**

(a) Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case.

(b) A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:

  (1) the original term of the lease is equal to or greater than the remaining economic life of the goods;

  (2) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

  (3) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or

  (4) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

. . .

(d) Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised. Additional consideration is not nominal if:

  . . . .

  (2) when the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods determined at the time the option is to be performed.

  . . . .

*Id.* § 1.203 (emphasis added).

### Discussion

*Effect of Codification of Former UCC Section 1.201(37) as Section 1.203*

Section 1.203 became effective September 1, 2003. *See id.* It is substantively identical to the portions of former UCC section 1–201(37) that distinguished leases from security interests. *Id.* cmt. However, it was decided to codify the law, in part, "to resolve an issue that created considerable confusion in the courts: what is a lease?" *Id.* cmt. 2.[4] In the opinion of the

---

4. The drafters of the UCC were likewise driven to codify the law with respect to the lease of goods by similar uncertainty in the definition of a lease, specifically by the necessity "to define lease to determine whether a transaction creates a lease or a security interest disguised as a lease." TEX. BUS. & COM.CODE ANN.

§ 2A.103 cmt. j (Vernon 1994). The drafters pointed out:

  If the transaction creates a security interest disguised as a lease, the transaction will be governed by the Article on Secured Transactions (Article 9) and the lessor will be required to file a financing statement or

drafters of the UCC, courts had focused on the intent of the parties and, in doing so, had relied on factors that the courts thought more consistent with sales or loans than leases but that, in fact, "were as applicable to true leases as to security interests." *Id.* The comments to section 1.203 direct that, in distinguishing a lease from a security agreement, we focus on economics, not on the intent of the parties. *Id.*

Whether a transaction is construed as a sale of personal property secured by a security interest or whether it is construed as a lease is determined by applicable state law. *In re Bailey*, 326 B.R. 156, 160 (Bankr.W.D.Ark.2005); *In re Copeland*, 238 B.R. 801, 803 (Bankr.E.D.Ark.1999). Because the UCC has been adopted nationwide, the courts may look for guidance to decisions from other jurisdictions in interpreting a uniform section of the Code. *See In re Rebel Rents, Inc.*, 291 B.R. 520, 526 (Bankr.C.D.Cal.2003); *In re Copeland*, 238 B.R. at 803. However, as the majority points out, the codification of section 1.203 makes case law prior to the 2003 effective date of section 1.203 suspect to the extent that prior law focuses on the intent of the parties to determine whether an agreement is a lease or a security interest. *See, e.g., Superior Packing, Inc. v. Worldwide Leasing & Fin., Inc.*, 880 S.W.2d 67, 71

(Tex.App.-Houston [14th Dist.] 1994, writ denied) (test for creation of security interest under UCC is whether transaction is intended to have effect of security); *cf. In re Triplex Marine Maint., Inc.*, 258 B.R. 659, 665–67 (Bankr.E.D.Tex.2000) (discussing problems with focus on parties' intent in determining whether lease should be characterized as secured transaction).[5]

Texas law prior to the codification of section 1.201(37) as section 1.203 focused heavily on the second prong of the test for a security interest, namely, whether the lease provided on its face that upon compliance with its terms the lessee would become the owner of the property without paying additional consideration, or by paying only nominal consideration, deeming such an agreement to be, as a matter of law, intended for security. *See Superior Packing*, 880 S.W.2d at 71–72; *see also Franklin Nat'l Bank v. Boser*, 972 S.W.2d 98, 103 (Tex.App.-Texarkana 1998, pet. denied) (stating with regard to section 1.201(37), that "[t]his test focuses on the economics of the transaction, rather than on the intent of the parties," but holding, "[u]nder this section, if a 'lease' or 'lease/purchase' instrument provides on its face that when the terms of the lease are complete the lessee becomes the owner of the property for no additional consideration, the lease is, as a matter of law, a

---

take other action to perfect its interest in the goods against third parties. There is no such requirement with respect to leases under the common law and, except with respect to leases of fixtures (Section 2A–309), this Article imposes no such requirement. Yet the distinction between a lease and a security interest disguised as a lease is not clear from the case law....

*Id.*

5. The distinction is important in this case because Excel's Lease Agreement provides that it is a lease and that conveys no ownership interest "except for any future option to purchase provided in this Lease." *See In re*

*Triplex Marine Maint., Inc.*, 258 B.R. 659, 666 (Bankr.E.D.Tex.2000) ("[T]he jurisprudence is clear that, in determining whether a document is a true lease or a disguised security agreement, this court is not bound by any 'acknowledgment' by the Debtor and not by any other language or designation of parties contained in the agreement"). I note, however, that the intention to create a security interest remains the distinguishing characteristic of a security interest. *See note 7 infra.* Therefore, intent in that sense remains an important consideration in a section 1.203 analysis.

security interest"); *Horton v. Dental Capital Leasing Corp.*, 649 S.W.2d 655, 657 (Tex.App.-Texarkana 1983, no writ) (if option price within an agreement with an option to purchase is nominal, instrument constitutes security agreement).[6] If the evidence shows the option price is not nominal, the instrument is not conclusively deemed a security agreement. *Horton*, 649 S.W.2d at 657 (holding that because dental equipment rental agreement denominated as lease provided that option price was fair market value at time option was exercised, jury's failure to find that instrument was not security agreement was not against great weight and preponderance of evidence); *Superior Packing*, 880 S.W.2d at 72 (holding that when consideration lessee must pay to become owner upon completion of terms of instrument is not nominal, determination of whether lease was intended for security is fact question); *Pierson v. GFH Fin. Servs. Corp.*, 829 S.W.2d 311, 315–16 (Tex.App.-Austin 1992, no writ) (evidence supported finding that lease was lease, rather than security agreement, even though lease provided option to purchase at fair market value at end, where parties indicated they intended to create lease and agreement was entitled lease); *see also* TEX. BUS. & COM.CODE ANN. § 1.203(d).

## Construction and Application of Section 1.203

### First Prong of Section 1.203(b) Test: Terminability of Consideration

In my opinion, the majority correctly focuses in this case on the *first* part of the test of a security agreement under section 1.203, namely *"the consideration* that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and *is not subject to termination by the lessee. ..."* TEX. BUS. & COM.CODE ANN. § 1.203(b) (emphasis added). However, I disagree with the majority's interpretation of the meaning and standard of proof of the first prong of the test.

Our April 19, 2007 opinion concluded that "Excel's leases expressly provide that they are subject to termination by the lessee" and, therefore, that "Excel's affirmative defense of nonownership based on its claim that its leases with its customers were security agreements fails as a matter of law." In its motion for rehearing, Excel argues that the panel made a mistake by interpreting subsection 1.203(b) as providing that if a lessee may terminate the *lease*, it is not a security agreement. It correctly points out that UCC section 1.203(b) provides that "[a] transaction in the form of a lease creates a security interest if the *consideration* that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee" and if one of the four additional conditions set out in subsection 1.203(b) is met. *Id.* (emphasis added). Excel argues that while its customer agreements provide that customers may terminate the *lease*, the agreements provide that they must

---

**6.** The *Horton* court further observed that two alternative tests were used to determine whether the option price was nominal:

> The first is to compare the option price to the market value of the equipment at the time the option is exercisable. If the option price is substantially less than the market value, the option price is nominal. The second test is to determine whether the terms of the option do not leave the lessee with any sensible alternative but to exercise the option. The two tests are not cumulative, but are alternative.

*Horton v. Dental Cap. Leasing Corp.*, 649 S.W.2d 655, 657 (Tex.App.-Texarkana 1983, no writ). The UCC's test for whether the purchase price is nominal or not is now set out in subsection 1.201(d), quoted *supra*.

still pay the full *consideration* required by Excel for the right to possession and use of the vehicles for the term of the lease.

In its opinion on denial of Excel's motion for rehearing, the majority states, "To create a security interest, the first part of this test requires that the *rental payments* the lessee must pay cannot be terminable by the lessee during the term of the lease." *Excel Auto & Truck Leasing, LLP v. Alief Indep. Sch. Dist.,* No. 01–04–01185–CV, 249 S.W.3d at 51 (Tex.App.-Houston [1st Dist.] Aug. 31, 2007, no pet. h.) (citing Tex. Bus. & Com.Code Ann. § 1.203) (emphasis added). It thus interprets consideration as "the rental payments." The majority then states that the Lease is not a security interest because it contains no " 'hell or high water clause,' which is essential to the existence of a security interest." *Excel Auto & Truck Leasing,* 249 S.W.3d at 51–52.

I agree with the majority that Excel's Lease Agreement is not a security agreement because the stream of rental payments (the consideration) is terminable prior to the end of the lease term. The critical reason for holding the consideration terminable, however, is not that upon complying with the early termination provisions the lessee is released from making further rental payments, it is that he is released from *any further obligation to Excel* and is not obligated to pay the entire amount of money he would be required to pay if he continued the lease to the end; he pays less. I also strongly disagree with the majority's statement that the essence of a security interest is a "hell or high water" clause and its implicit holding that a "hell or high water" clause is a talisman for finding a security interest instead of a lease. I believe this implicit holding is both inaccurate and misleading and can only introduce even further confusion into this difficult area of the law in which

courts are required to distinguish among (1) a *true lease;* (2) a true lease that is a *finance lease;* and (3) a *security interest* retained by the lender in a *financing transaction* to secure the debtor's performance, which is not a lease.

*Finance Lease*

The majority confuses a finance lease, which is one type of true lease, with a security interest, which is not a lease at all. A "hell or high water" clause is not the essence of a security interest. It can appear in any kind of agreement, but it is, in particular, the essence of a *finance lease,* which is a true *lease* governed by article 2A of the UCC, *not* a secured transaction, which is governed by article 9 of the UCC. *See Triplex,* 258 B.R. at 665–67.

A finance lease is a three-party transaction. It is defined by the UCC as "a *lease* with respect to which ... the lessor does not select, manufacture, or supply the goods"; "the *lessor* acquires the goods or the right to possession and use of the goods in connection with the lease"; and one of four other conditions is met, i.e., (i) the lessee receives a copy of the contract by which the lessor acquired the goods or the right to their use and possession; (ii) the lessee's approval of the contract by which the *lessor* acquired the goods or the right to their use and possession is a condition to the effectiveness of the lease (iii) the lessee, before signing the lease contract, receives a statement designating the promises and warranties and disclaimers provided to the *lessor* by the third party's supplier; or, (iv) if the lease is not a consumer lease, the lessor informs the lessee in writing of (a) the identity of the supplier unless the lessee has selected the supplier and directed the lessor to acquire the good or the right to use and possession, (b) the lessee's entitlement to promises and warranties provided to the lessor by the supplier, and (c) the lessee's right

to communicate with the supplier and receive the warranties and disclaimers from it. TEX. BUS. & COM.CODE ANN. § 2A.103(7) (Vernon Supp.2006) (emphasis added).

*Hell or High Water Clause*

A "hell or high water" clause is defined by article 2A of the UCC, governing leases, as "a term in the lease agreement that provides that the lessee's promises under the lease contract become *irrevocable and independent* upon the lessee's acceptance of the goods...." TEX. BUS. & COM.CODE ANN. § 2A.407(a) (Vernon 1994) (emphasis added); *see also id.* cmt. 1 (extending "hell or high water" protection to leases that are not consumer leases). The "hell or high water" clause "makes covenants in a finance lease irrevocable and independent due to the function of the finance lessor in a three party relationship: the lessee is looking to the supplier to perform the essential covenants and warranties.... Thus, upon the lessee's acceptance of the goods the lessee's promises to the lessor under the lease contract become irrevocable and independent." *Id.* cmt. 1 (citation omitted); *see also GreatAmerica Leasing Corp. v. Star Photo Lab, Inc.,* 672 N.W.2d 502, 504 (Iowa Ct.App.2003) ("hell or high water" clause "makes a lessee's obligation under a finance lease irrevocable upon acceptance of the goods, despite what happens to the goods afterwards."). The clause, as characterized by the UCC for finance leases, is thus a specialized clause peculiar to a three-party transaction, which insures that the payments owed by the lessee to a lessor who does not manufacture or supply the leased goods are independent of the state of the goods and irrevocable, so that the lessee looks to the manufacturer or supplier of goods for warranties and remedies for defects in the goods, not to the lessor. It does not merely indicate that payments under a lease cannot be terminated before completion of the lease clause; it indicates more.

A "hell or high water" clause is thus neither the essential feature of a security agreement nor a distinguishing feature between a lease and a security agreement. Indeed, if the first prong of section 1.203(b)'s two-pronged test for a *security agreement* could be satisfied *only* by the agreement's incorporating the essential feature of a type of true *lease,* as the majority implicitly holds, section 1.203(b) would serve no function other than to confuse courts and litigants, and it would not meet the UCC drafters' goal in codifying section 1.203 of providing guidance to courts to enable them to *distinguish* between a lease and a security agreement. *See* TEX. BUS. & COM.CODE ANN. § 1.203 cmt. 2.

*Non–Terminability of Consideration as Test of Security Agreement Under Section 1.203(b)*

I would hold that the first prong of section 1.203(b)'s "bright line" test for distinguishing between a security agreement and a lease should be interpreted according to its plain language and the intent of the section's drafters. Specifically, "A transaction in the form of a lease creates a security interest [1] if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and [2] is not subject to termination by the lessee." TEX. BUS. & COM.CODE ANN. § 1.203(b). Under this test, it is not necessary that the agreement contain a true "hell or high water" clause as defined in article 2A of the UCC to constitute a security interest; it must only provide that the full consideration due under the terms of the lease not be terminable by the lessee.

Here, the obligation of a lessee to Excel *is* expressly made subject to early termination by the lessee, relieving the lessee of the obligation to pay Excel the total

amount due for possession and use of the vehicle for the full term of the Lease. The lessee may terminate his own obligation under the Lease at any time, return the vehicle, and pay Excel *less* than he would have to pay if he completed the lease. Upon the vehicle's return at any time, Excel *subtracts* the Retained Value of the vehicle from the total consideration due and adds any agreed upon fees and charges, and the lessee is relieved of any further obligation. Indeed, the lessee does not even have the option to purchase the vehicle until he has completed a specified number of monthly payments. Nor is Excel required to provide a purchase option.

I agree with the majority, therefore, that, in this case, it is unnecessary to look beyond the first prong of section 1.203's bright line test to determine that the Lease is not a security interest because the consideration due under its terms *is* terminable prior to the end of the lease term by the lessee; therefore, the first prong of section 1.203(b)'s bright line test of a security agreement is not satisfied. If the Excel Lease Agreement *had* satisfied the first prong of section 1.203(b)'s test of a security agreement, however—if, for example, it had had a "hell or high water clause" the Agreement still would not necessarily have been a security interest instead of a lease.

### Second Prong of Section 1.203(b) Test: Distinction Between Lease and Security Interest

A lessee's inability to terminate a lease without paying the full consideration due under the agreement is only the *first* criterion a security interest must meet; a transaction in the form of a lease that meets that criterion must still satisfy one of the subparts of section 1.203 to be considered a security interest. *See, e.g., In re Bailey,* 326 B.R. 156, 162 (Bankr.W.D.Ark. 2005) (if lessee does not have right to terminate alleged equipment lease, but none of four statutory conditions is satisfied, then court cannot find, as matter of law, that alleged lease is actually disguised security agreement; it must still examine specific facts of case to determine whether, despite failing "bright line" test, economics of transaction still suggest security interest); *In re Vital Prods. Co.,* 210 B.R. 109, 112 (Bankr.N.D.Ohio 1997) (so-called lease was security agreement where it obligated lessee to make stream of payments for entire term of lease with no right to terminate and enabled lessee to acquire leased property for nominal payment considerably less than anticipated remaining fair market value, economically compelling lessee to exercise buyout); *cf. In re Charles,* 278 B.R. 216, 222 (Bankr.D.Kan.2002) (to find security interest rather than lease, statute requires "hell or high water clause" and lessor's not retaining any residual value or interest in leased property based upon four factors outlined in statute).

If a transaction in the form of a lease has a "hell or high water" clause, or other non-terminability provision, satisfaction of the first prong of the test is not a factor in determining whether the transaction is a lease or a security agreement because such a provision may appear in *either* a lease, including a finance lease, *or* a security agreement. In that case, the courts must look to the definition of a lease (including the definition of a financing lease in section 2A.1.03(74)) and of a security interest,[7] and also to the facts of the case,

---

7. Under the UCC, a "security agreement" is not required to have *any* particular form. Rather, the UCC defines a security agreement merely as "an agreement that creates or pro-

vides for a security interest." Tex. Bus. & Com.Code Ann. § 9.102(74) (Vernon Supp. 2006). Generally, the test for the creation of a security interest under Texas law is whether

to determine whether the instrument is a lease or a security interest. *See Triplex,* 258 B.R. at 667–69 (holding that agreement which contained "hell or high water" clause was security agreement "as a matter of law," even though agreement itself stated it was finance lease, when lease was not terminable by lessee prior to end of designated lease term and one of four factors enumerated in section 1.203(b) was satisfied); *In re Extraction Techs.,* 296 B.R. 393, 398, 400–02 (Bankr.E.D.Va.2001) (alleged equipment lease under which lessor would have no choice other than to make alleged "option" payment and become owner of equipment at end of lease term and under which lessee's payments precisely equaled lessor's costs in acquiring equipment, together with interest, was not true "lease" but disguised security agreement, despite denomination as finance lease); *see also United Airlines, Inc. v. HSBC Bank USA, N.A.,* 416 F.3d 609, 617 (7th Cir.2005) (transaction in form of facilities lease was not "true lease" but financing device where (i) it contained "hell or high water" clause; (ii) at end of lease lessor had no remaining interest, contrary to transaction language; rather, full tenancy interest reverted to lessee for no additional charge, satisfying "the UCC's *per se* rule for identifying secured credit"; (iii) balloon payment had no parallel in true lease, but was common feature of secured credit; and (iv) on prepayment, lease and sublease would terminate immediately rather than secure tenant's right to occupy property for additional period); *cf. In re Rebel Rents,* 291 B.R. at 527–28 (lessee did not satisfy burden of showing that equipment leases executed as part of sales-and-leaseback arrangement were not true leases but disguised security agreements where, although debtor did not have option of terminating leases early and paid all taxes, maintenance, and insurance on equipment and assumed all risk of loss, lease terms were for less than useful lives of equipment and debtor did not have option at end of lease terms to renew leases or to purchase equipment for no or nominal consideration); *Siemens Credit Corp. v. Newlands,* 905 F.Supp. 757, 763 (N.D.Cal.1994) (lease was finance lease where lessor did not select manufacturer of supply equipment, lessor acquired equipment only to lease it to lessee, and lessee executed purchase agreement assignment, which it received and approved in connection with execution of lease).

The Excel Lease does not attempt to secure the lessee's performance until the

---

the transaction was intended to have the effect of security because the parties must have intended that their transaction fall within the scope of the UCC's provisions governing secured transactions. *Morgan Bldgs. & Spas, Inc. v. Turn–Key Leasing, Ltd.,* 97 S.W.3d 871, 876 (Tex. App.-Dallas 2003, pet. denied). Accordingly, the court must look to the transaction to determine whether the parties intended to create a security interest in the property for the purpose of securing payment or performance of an obligation. *Id.* No formal wording is required to create a security interest; rather, the court should examine the substance of the documents in light of the circumstances of the case. *Id.* The true intent of the parties is determined by examining "the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* (quoting *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983)); *see also In re Quisenberry,* 295 B.R. 855, 860–61 (Bankr. N.D.Tex.2003) (security agreement is agreement that creates or provides for an interest in personal property that secures payment or performance of some obligation; key requirement is that agreement, or some ancillary document, create or provide for security interest; in construing security agreement, primary role of court is to ascertain true intent of parties); *In re Sutton,* 365 B.R. 900, 905 (B.A.P. 8th Cir.2007) (security agreement need not be denominated as such or have any particular form; all that is required is objective manifestation in language of debtor's agreement to grant security interest in collateral in favor of creditor).

consideration due for the entire lease term is paid and the purchase option exercised, i.e., the Lease does not satisfy the first test of a security interest. *See In re Quisenberry*, 295 B.R. 855, 860 (Bankr. N.D.Tex.2003). But even if it had satisfied that prong, it would not satisfy the second. In particular, the fact that lessees have a purchase option does not make the transaction evidenced by the Excel Lease a secured financing transaction for the purchase of a vehicle. There is no reference to "sale" or "collateral" or to the parties' intent to create a security interest; quite the contrary. Nor does the Lease evidence the parties' intent that a sale take place and that title pass from Excel to the lessee. Rather, title remains with Excel unless and until specified conditions set out in the Lease are satisfied and the purchase option is both granted and exercised. Indeed, the Excel Lease satisfies the "hallmark" of a *lease* in that it grants the lessee the right to use the vehicle for a period less than its economic life with the concomitant obligation (unless the purchase option is exercised) to return the property to the lessor, Excel, while it still retains some substantial economic value. *See In re QDS Components, Inc.* 292 B.R. 313, 322 (Bankr.S.D.Ohio 2002); *see also In re Marhoefer Packing Co., Inc.*, 674 F.2d 1139, 1145 (7th Cir.1982); *In re Shores*, 332 B.R. 31, 39 (M.D.Fla.2005).

A number of other courts have reached the same conclusion on a similar basis. *See In re Powers*, 983 F.2d 88, 91 (7th Cir.1993) (concluding that "even though the lessee can acquire the goods at the end of the lease's term, the lessee is under no obligation to make the payments that will allow him to exercise the option"); *In re Marhoefer*, 674 F.2d at 1143 (holding that "where the lessee has the right to terminate the transaction, it is not a conditional sale"); *In re Celeryvale Transp., Inc. v. M.W. Kellogg Co.*, 822 F.2d 16, 18 (6th Cir.1987) (holding that lease was true lease, rather than security instrument in disguised sale, where lessee was obligated to return leased equipment at lease's end if it decided not to invoke purchase option, but had no obligation to exercise option to purchase property); *In re Shores*, 332 B.R. at 39 (holding that agreement was true lease where agreement expressly stated that lessee could terminate lease at any time by written notice to lessor and have no further obligation except for liability for damage to leased property during lease term and where useful life of leased property exceeded term of lease); *In re Copeland*, 238 B.R. 801, 806 (Bankr.E.D.Ark. 1999) (holding, under Arkansas law, that even though section 1.203 "does not require a finding as a matter of law that a transaction is a true lease based only on the fact the lessee may terminate the lease at any time," this fact precluded finding that transaction was sale).

Excel's Motor Vehicle Lease Agreement is what it says it is: "a lease only" that transfers "no ownership interests in the Vehicle except for any future option to purchase provided in this Lease." The lessees are lessees as the UCC defines that term (as "a person who acquires the right to possession and use of goods under a lease"); Excel is a lessor as the UCC defines the term (as "a person who transfers the right to possession and use of goods under a lease"); and the Lease Agreement is a true lease agreement and not a sales contract that creates a security interest in the collateral, as defined in the UCC ("[a] 'sale' consists in the passing of title from the seller to the buyer for a price"; a "[c]ontract for sale' includes both a present sale of goods and a contract to sell goods at a future time"). TEX. BUS. & COM.CODE ANN. §§ 2A.103 (defining "lessee" and "lessor"), 2.106 (defining "sale" and "sales contract").

Because Excel's Motor Vehicle Lease Agreement is a true lease, the lessees are not owners of the leased vehicles. Excel is the owner of the vehicles for UCC purposes as well as ad valorem tax purposes.

### Conclusion

I would grant Excel's motion for rehearing. I would hold that, for the foregoing reasons, the taxing authorities conclusively established their right to summary judgment. Therefore, I concur in the panel's judgment affirming the summary judgment in favor of the taxing authorities.